878 F.2d 1444
 Unpublished Disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
Sidney P. SELIGSON, Petitioner,
v.
OFFICE OF PERSONNEL MANAGEMENT, Respondent.
 No. 89-3068.
 United States Court of Appeals, Federal Circuit.
 May 5, 1989.
 
 Before RICH, Circuit Judge, NICHOLS, Senior Circuit Judge, and ARCHER, Circuit Judge.
 PER CURIAM.
 
 DECISION
 
 1
 We affirm the decision of the Merit Systems Protection Board (MSPB), Docket No. DA831M8810234, which affirms the refusal of the Office of Personnel Management (OPM) to grant petitioner Sidney P. Seligson a waiver of his debt to the United States in the amount of $8,899.91, owed by him to reinstate his retirement account, in view of his reinstatement as a civilian employee of the United States Air Force.
 
 OPINION
 
 2
 Mr. Seligson suffered a removal for cause and withdrew the sums credited as his contribution to his Civil Service Retirement Account. He used the money to finance his legal opposition to the removal and was successful so far as he obtained reinstatement at a lower grade to follow a 60-day suspension. His remedy also included a back pay award totaling $16,902.88 which the Air Force paid to the OPM and restored the retirement account to that extent; the amount now in issue is the amount the account is still short. Mr. Seligson asks forgiveness under 5 U.S.C. Sec. 8346(b), which allows it if, in the judgment of OPM, the individual is without fault and recovery against him would be against equity and good conscience. Day v. OPM, 833 F.2d 1580 (Fed.Cir.1987), on remand, --- F.2d ---, (Fed.Cir. April 27, 1989), differs in that here, no claim is made for forgiveness of the portion of the refund already paid the OPM out of the back pay award.
 
 
 3
 The OPM concedes that Mr. Seligson is without fault. It regards the issue as whether he meets its definition of equity and good conscience by showing recovery would cause financial hardship to him. 5 C.F.R. Sec. 831.1403. His own statement of the issue is broader inasmuch as he feels he should have been, but was not, warned the sum he withdrew would have to be repaid if he were successful in his appeal and obtained reinstatement. Ignorant of this, he says he quit a better paying job in the private sector to resume his old job with the Air Force. He says he does not have the sums he withdrew because he expended them to defeat his wrongful removal, and this too makes it inequitable in his eyes to require him to repay.
 
 
 4
 He filed two "Financial Resources Questionnaires" (FRQ) on a form devised for such cases as this by the OPM. The MSPB administrative judge (AJ) went over them in great detail and found inadequate to substantiate that collection of the $8,899.91 would cause Mr. Seligson any real hardship. The finding is reasonable in view of the evidence. As to his actual financial resources, his answers to questions raise two for every one they answer. For example, it plainly appears from several items that Mr. Seligson, besides his Air Force job and his interim private sector job, carries on a private business on rented premises. To know if repaying $8,899.91 would cause him hardship, one would need to know the nature of the business, its income, net worth, assets and liabilities, but the FRQ is silent as to all these. An even more striking item is the following entry:
 
 
 5
 I lost $62,000 in an uninsured savings acount on March 7, 1988, at First Mercantile Corporation. They declared bankruptcy. First Mercantile is not a bank, Savings & Loan or credit union.
 
 
 6
 This was just two weeks before Mr. Seligson signed his second FRQ. Mr. Seligson resides in Wichita Falls, Texas. The entry may be perfectly plain to a Texan, and the woes of the Texas banking industry are public knowledge. A nonTexan wants to know, as the AJ did, what kind of institution is it that is not a bank, Savings and Loan, or credit union, but carries savings accounts? Only two weeks after it had "declared bankruptcy," Mr. Seligson knew he had lost his entire deposit. How did he know there was nothing at all for depositors? What went on? Furthermore, it appears the OPM notified Mr. Seligson of his obligation to refund the $8,899.91 on June 10, 1987, so he had the opportunity to pay that sum out of his "savings account" with First Mercantile from then until March 7 the following year. Apparently the retirement fund is supposed to share the cost of Mr. Seligson's mistaken reliance on an institution that is neither a bank, savings and loan, or credit union, as a depository for his savings.
 
 
 7
 Mr. Seligson's "gross medical" ran to $30,000 some prior years, with $2,500 "out of pocket," i.e., not covered by insurance. He had quadruple bypass heart surgery in 1984. He has to go for medical treatment 135 miles to Dallas, Texas from Wichita Falls, causing current uninsured expense. He reports, irregularly but he is a layman, that his wife had surgery in early 1989 for cancer of the spinal bone and canal, and it was not entirely successful with ominous implications.
 
 
 8
 It seems clear Mr. Seligson failed to convince the AJ that payment of the $8,899.91 would be a hardship or that he did not have that sum available among his assets, because he did not really know himself. His financial affairs are too complex and mysterious for ready analysis, at least without an audit which the OPM was under no obligation to conduct. It seems obvious that the hardship claim is asserted largely to keep Mr. Seligson's assets, or some of them, clear for future creditor's claims. The government, having been standing in line since June 10, 1987, is entitled to be paid when it is entitled to be paid, without regard to future creditors not as yet in the line.
 
 
 9
 The AJ also found that Mr. Seligson does not have equities based on "detrimental reliance." The original payment from the retirement account was not an erroneous payment or overpayment. Mr. Seligson was entitled to receive it and refusal to pay it on his request would have been wrong. When the opportunity for reinstatement was opened up, he had a better paying private sector job and could have kept it, and kept the withdrawal too. As the AJ points out, reinstatement revived his claim on the government contribution over 18 years to his retirement account, which otherwise would have been lost to him. It cannot be said this was a detriment, and as a result, Mr. Seligson cannot be said to have made any decision respecting the fund which was to his detriment.
 
 
 10
 We also do not find any specific evidence that any government official made any statement of the kind that produces estoppel problems in some other cases. They supposed he was not coming back and, of course in that event, he would not have made any mistake in drawing out his contributions to the fund. Only, he did come back.